IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DAYSEAN M. HENDERSON,** : | **CIVIL ACTION NO. 1:19-CV-1468** |
| : | |
| **Plaintiff** : | **(Judge Conner)**[1] |
| : | |
| v. : | |
| : | |
| **LAWRENCE P. MAHALLY**, *et al.*, : | |
| : | |
| **Defendants** : | |

**MEMORANDUM**

Plaintiff Daysean M. Henderson, an inmate in state custody, filed this *pro se* action asserting constitutional tort claims under 42 U.S.C. § 1983 and medical malpractice under Pennsylvania law. He alleges Section 1983 claims for (1) Eighth Amendment deliberate indifference to serious medical needs and (2) retaliation in violation of the First Amendment. Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. They contend that they are entitled to judgment as a matter of law on all of Henderson's federal claims and on his medical malpractice claim against one physician defendant. We will grant in part and deny in part defendants' Rule 56 motions.

---

[1] This case was previously assigned to the Honorable John E. Jones III. It was transferred to the undersigned shortly after Judge Jones' retirement from the federal bench on August 1, 2021.

**I.     Factual Background**[2]

The facts in this case are largely undisputed. Indeed, defendants cite almost exclusively to Henderson's complaint for their Rule 56.1 statement of material facts, (see generally Doc. 62), and Henderson naturally agrees with much of defendants' recitation, (see Doc. 71 at 1-3).

On September 4, 2017, Henderson was accidentally elbowed in the jaw while playing basketball at the State Correctional Institution in Dallas, Pennsylvania (SCI Dallas).[3] (Doc. 62 ¶ 1; Doc. 62-1, Henderson Dep. 7:15-17). According to Henderson, the pain in his jaw grew increasingly severe over the following days, and on September 11 he notified a correctional officer, who immediately sent him to the prison infirmary. (Doc. 1 at 22-23 ¶ 5; Henderson Dep. 8:4-24). The medical department at SCI Dallas ordered X-rays of Henderson's jaw, which revealed a fracture. (Henderson Dep. 9:9-14). Henderson was then sent to an outside medical

---

[2] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. Id. Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (Docs. 62, 71, 74). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the Rule 56.1 statements. Henderson does not provide numbered paragraph responses, so we will cite to the page numbers of his Rule 56.1 statement.

[3] During all times relevant to this lawsuit, Henderson was incarcerated at SCI Dallas. (See Doc. 62 ¶ 1). He is currently housed at Luzerne County Correctional Facility.

2

facility, where he claims a CT scan showed an additional jaw fracture. (Doc. 1 at 22 ¶ 8).

On September 18, 2017, medical staff at SCI Dallas sent Henderson to see Kirk Hughes Johnson, M.D., a private oral surgeon at Geisinger Wyoming Valley Medical Center. (Id. ¶ 10; Doc. 74 ¶ 2). Dr. Johnson operated on Henderson's broken jaw one week later, implanting a metal plate, "arch bars," screws, and wires to fixate Henderson's jaw to allow for healing of the fractures. (Doc. 1 at 23 ¶¶ 12-13; Doc. 62 ¶ 2; Doc. 74 ¶¶ 3-4). As Henderson explains, the arch bars and wires essentially "wired" his jaw shut. (Doc. 1 at 23 ¶ 13; Henderson Dep. 12:5-12). Henderson was housed in the infirmary at SCI Dallas for approximately two months following the surgery. (Henderson Dep. 12:17-13:1).

On November 1, 2017, Henderson returned to Geisinger Wyoming Valley Medical Center for a follow-up visit with Dr. Johnson. (Doc. 1 at 24 ¶ 16; Henderson Dep. 13:15-18). Henderson recalls that, at this visit, Dr. Johnson told him that his jaw fractures were "completely healed" but wanted to keep the arch bars in place for an additional week as a precaution. (Doc. 62 ¶ 3; Henderson Dep. 13:18-14:4). Henderson recounts that defendants Lea Martin (the "Health Care Administrator") and Dr. Scott Prince examined him upon return to SCI Dallas and released him from the infirmary back to regular prison housing the next day. (Doc. 1 at 5; id. at 24 ¶ 17; Henderson Dep. 19:13-17).

Henderson's medical problems began shortly after returning to his normal housing unit. He expected to be sent back to Dr. Johnson in one week for removal

3

of the arch bars, but that time came and passed with no action by SCI Dallas medical staff. (See Doc. 1-2 at 1; Henderson Dep. 16:15-19). On December 12, 2017, Henderson sent a Form DC-135A "Inmate's Request to Staff Member" (hereinafter DC-135A request) to defendant Deputy Superintendent George Miller, complaining that his medical hardware should have been removed "weeks ago," that he had "yet to have the procedure done," and that it appeared that some of the hardware was loosening and causing an infection. (Doc. 1-2 at 1; Doc. 62 ¶ 4). Henderson sent a similarly worded DC-135A request to Dr. Prince the same day. (Doc. 1-3 at 1). Review of the DC-135A request to Miller shows that he responded two days later, informing Henderson that he was "forwarding [Henderson's] request for follow-up." (Doc. 1-2 at 1).

It appears that Dr. Prince forwarded the DC-135A request addressed to him to Martin because, on December 18, Martin wrote back to Henderson on that same request form, explaining that "I just got this [request] and you will be seen by Dental as soon as possible." (Doc. 1-3 at 1; Doc. 62 ¶ 5). Martin also responded that day to Henderson via the DC-135A request directed to Miller, stating, "I am going to have you evaluated by Dr. Amin this week. When Dr. Prince reviewed your last visit from the outside provider, he was under the impression they removed the [arch bars]. Next time, write directly to me." (Doc. 1-4). Henderson saw defendant Dipti Amin (a "Dentist/Dental Tech") the following day. (Doc. 1 at 7; Doc. 62 ¶ 6; Henderson Dep. 17:9-13). Dr. Amin informed Henderson during this visit that he

4

would be referred to a surgeon "immediately." (Doc. 62 ¶ 6; Henderson Dep. 17:14-17).

Henderson avers that nothing happened for almost a month, so he initiated the formal administrative grievance process because of the pain and ongoing hardware problems he was experiencing. (Doc. 1-5; Doc. 62 ¶ 7; Henderson Dep. 17:24-18:3). In grievance number 716959—dated January 17, 2018—Henderson requested immediate attention for removal of the arch bars, medical evaluation for any injury that he may have sustained from them being in place for too long, and monetary damages. (Doc. 1-5 at 2). The initial grievance officer rejected the grievance in a stock response, marking the "rationale" box that said, "The grievance was not submitted within fifteen (15) working days after the events upon which claims are based." (Doc. 1-6). Defendant Superintendent Lawrence P. Mahally denied Henderson's appeal, upholding the grievance officer's conclusion. (Doc. 1-7 at 2). Henderson's final appeal to the Secretary's Office of Inmate Grievances and Appeals was likewise denied. (Doc. 26-3 at 1).

After the initial grievance rejection, but before receiving Mahally's first-level appeal denial, Henderson sent a DC-135A request to Dr. Amin dated February 1, 2018. (Doc. 1-8). In this request, Henderson reminded Dr. Amin about the December 19 appointment and her statement that said she would promptly refer Henderson to an oral surgeon. (Id.) Dr. Amin responded on February 7, stating, "I did follow up and you have been scheduled for [the] oral surgeon." (Id.) On March

5

5, 2018, Henderson was seen by Dr. Johnson, who removed the arch bars. (Henderson Dep. 24:18-25:1).

On February 23, 2018, while the formal grievance process was ongoing, Henderson received a misconduct from defendant C.O. Scott Owen. (Doc. 1-9; Doc. 62 ¶ 9). According to the misconduct report, Henderson had illicitly acquired buprenorphine ("Suboxone") and synthetic cannabinoids ("K-2") from one of his regular visitors. (Doc. 1-9). The misconduct report further indicated that the sanction was warranted due to Henderson's "self admission [sic] to the possession of a controlled substance." (Id.)

Henderson maintains that this misconduct was fabricated and issued in retaliation for filing grievance number 716959. (See Doc. 1 at 28 ¶ 32; Henderson Dep. 22:13-17). In his deposition, Henderson testified that Owen explicitly told him that "if I stopped filing grievances then the misconduct would go away." (Henderson Dep. 22:18-24). Henderson claims that Owen offered this *quid pro quo* to him on the day of the misconduct and again at some later time through an unidentified security officer. (Id. 22:25-23:6). He also avers that Owen and defendant hearing examiner Charlie McKeown spoke privately before the misconduct hearing and then presented Henderson with one "last chance" to take the deal, which Henderson refused. (Id. 23:11-19). McKeown found Henderson guilty of the misconduct. (Doc. 62 ¶ 10). Henderson maintains that he pled not guilty at the hearing but was not permitted to explain or defend himself and was "immediately put in handcuffs." (See Doc. 1-10; Henderson Dep. 23:16-19). As

punishment for the misconduct, Henderson was placed into disciplinary segregation in the Restricted Housing Unit for 90 days. (Doc. 71 at 3).

Henderson filed suit in August 2019. He alleges Eighth Amendment violations for deliberate indifference to serious medical needs against defendants Miller, Mahally, Martin, Dr. Prince, Dr. Amin, and Dr. Johnson. (Doc. 1 at 10 ¶ 1). He also asserts a First Amendment retaliation claim against all defendants except Dr. Johnson for either (1) purposefully delaying medical treatment or (2) fabricating and prosecuting a misconduct in retaliation for filing grievances. (Id. at 11-12 ¶¶ 2-4). Finally, Henderson asserts state-law medical negligence claims against defendants Martin, Dr. Johnson, Dr. Amin, and Dr. Prince. (See Doc. 1 at 48-51).[4]

The Department of Corrections (DOC) defendants—Miller, Mahally, Martin, Dr. Amin, Dr. Prince, Owen, and McKeown—move for summary judgment on all of Henderson's Section 1983 claims. (Doc. 60). Dr. Johnson moves for summary judgment on all federal and state-law claims asserted against him. (Doc. 72).

## II. Legal Standard

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality. See FED. R. CIV. P. 56(a). The

---

[4] Henderson's complaint does not explicitly identify which defendants he is suing for medical malpractice. However, he provides certificates of merit, pursuant to Pennsylvania Rule of Civil Procedure 1042.3(a)(3), for defendants Martin, Dr. Johnson, Dr. Amin, and Dr. Prince. (Doc. 1 at 48-51). We thus conclude that these four medical providers are the target of Henderson's medical negligence allegations, as a certificate of merit is a prerequisite for such a claim under Pennsylvania law. See generally PA. R. CIV. P. 1042.3.

burden of proof is on the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(a), (e). Only if this threshold is met may the cause of action proceed. Pappas, 331 F. Supp. 2d at 315.

### III. Discussion

Defendants contend that Henderson cannot carry his Rule 56 burden on any of his constitutional tort claims, and Dr. Johnson additionally challenges Henderson's medical malpractice claim. We take each cause of action in turn.

#### A. Eighth Amendment Medical Deliberate Indifference

The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishment on prisoners. See Farmer v. Brennan, 511 U.S. 825, 832 (1994). In the context of prison medical care, the Eighth Amendment "requires prison officials to provide basic medical treatment" to incarcerated individuals. Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). To establish an Eighth Amendment claim of deliberate indifference regarding inadequate medical care, a plaintiff must demonstrate (1) "a serious medical need," and (2) "acts or omissions by prison officials that indicate deliberate indifference to

that need." Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003). A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987).

Deliberate indifference by prison officials may be evidenced by intentional refusal to provide care known to be medically necessary, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, and denial of reasonable requests for treatment resulting in unnecessary suffering or risk of injury. See Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993) (quoting Lanzaro, 834 F.2d at 346). Deliberate indifference to serious medical needs is an exacting standard, requiring a showing of "unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (citation omitted). Claims sounding in mere medical negligence will not suffice. Rouse, 182 F.3d at 197.

When judged against these legal guideposts, Henderson's Eighth Amendment claims fall well short of the mark. As to Miller, Henderson's only assertion is that he sent Miller a DC-135A request and did not receive the sought-after arch bar removal until months later. The problems with this claim are twofold: (1) Miller properly responded to Henderson's DC-135A request within 48 hours and (2) Miller, who is not a medical provider, forwarded Henderson's treatment request to appropriate medical staff. In no way could Miller's actions be deemed "deliberately indifferent" to Henderson's medical needs.

9

Henderson's Eighth Amendment claim against Mahally likewise fails. Mahally's only connection to Henderson's medical treatment stems from the denial of Henderson's first-level grievance appeal. But involvement in the grievance process alone does not give rise to Section 1983 liability. See Lewis v. Wetzel, 153 F. Supp. 3d 678, 696-97 (M.D. Pa. 2015) (collecting cases); see also Brooks v. Beard, 167 F. App'x 923, 925 (3d Cir. 2006) (nonprecedential); Alexander v. Gennarini, 144 F. App'x 924, 925 (3d Cir. 2005) (nonprecedential) (explaining that district court "properly dismissed" prisoner's claims against certain defendants because allegations against them "merely assert their involvement in the post-incident grievance process"). Henderson has thus failed to produce evidence of deliberate indifference to medical needs by Mahally, whose only involvement was upholding a grievance rejection.

Henderson fares no better with the healthcare defendants: Martin, Dr. Prince, Dr. Amin, and Dr. Johnson. The gravamen of his claims against them is that their deliberate indifference is demonstrated solely by the unreasonable delay in his medical care—*i.e.*, having to wait until March 2018 to have the arch bars removed when they should have been removed in November 2017. (See Doc. 66 at 1-2, 4-5). The record, however, does not support Henderson's assertions of deliberate indifference.

Martin, for her part, swiftly responded to both DC-135A requests forwarded to her by Miller and Dr. Prince. She explained the situation to Henderson and assured him that he would see Dr. Amin as soon as possible. Henderson was then

10

seen by Dr. Amin the very next day. None of these actions evince deliberate indifference—in fact, they show the opposite. Furthermore, Martin transferred Henderson to the care of an appropriate medical professional for treatment and received no further contact from Henderson even after specifically advising him that if another issue arose, "write directly to me." (Doc. 1-4). Thus, Martin cannot be considered to have acted with deliberate indifference to Henderson's medical needs. See Durmer, 991 F.2d at 69. Martin placed Henderson in the care of a specialist, properly assumed this professional would treat Henderson's dental issues, and justifiably expected that, if further issues developed, Henderson would follow instructions and contact her directly. See id.

Henderson has not shown deliberate indifference by Dr. Amin, either. Dr. Amin first treated Henderson on December 19. During that visit, Henderson avers that Dr. Amin told him he would be referred to the oral surgeon immediately. It appears that this referral did not occur until after Henderson sent Dr. Amin a follow-up DC-135A request on February 1, 2018, to which Dr. Amin responded and referred Henderson to Dr. Johnson. Henderson provides no explanation for why he waited nearly six weeks to send a follow-up DC-135A request to Dr. Amin. This is especially perplexing because his previous DC-135A requests received prompt attention from SCI Dallas staff, and because he was specifically advised to contact Martin if he experienced further problems. Even in a light most favorable to Henderson, the evidence he has adduced of Dr. Amin failing to timely schedule a referral infers only potential negligence, not deliberate indifference. And a showing

11

of possible medical negligence is insufficient for an Eighth Amendment claim. Rouse, 182 F.3d at 197.

Henderson supplies even less evidentiary support for his claims against Dr. Prince and Dr. Johnson. Dr. Prince's involvement in Henderson's treatment is limited to a single DC-135A request, which Dr. Prince forwarded to Martin. Although Dr. Prince mistakenly believed the arch bars were removed at the November 2017 visit with Dr. Johnson, such a fact would only tend to implicate negligence, not deliberate indifference. As for Dr. Johnson, Henderson has proffered no evidence that would indicate deliberate indifference. Henderson simply relies on the fact that his arch bars were not removed until March 2018, several months after they should have been removed. This circumstance is entirely insufficient to show "unnecessary and wanton infliction of pain" by Dr. Johnson. Estelle, 429 U.S. at 104.

Henderson's Eighth Amendment claim against Dr. Johnson fails for an additional reason. Only state actors can be subject to Section 1983 liability. See 42 U.S.C. § 1983; Kach v. Hose, 589 F.3d 626, 646 (3d Cir. 2009). Dr. Johnson is a private physician, and Henderson has provided no evidence that Dr. Johnson should be deemed a state actor or that Dr. Johnson's private medical care could be considered state action. See Kach, 589 F.3d at 646. "Action taken by private entities with the mere approval or acquiescence of the State is not state action." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 52 (1999) (citation omitted).

In sum, Henderson has not adduced evidence that would demonstrate deliberate indifference by any named defendant.  Moreover, Dr. Johnson is not a state actor subject to Section 1983 liability.  Therefore, we must grant summary judgment in these defendants' favor on Henderson's Eighth Amendment claims.

**B.     First Amendment Retaliation**

Although a prisoner's constitutional rights are necessarily circumscribed, an inmate still retains First Amendment protections when they are "not inconsistent" with prisoner status or with "the legitimate penological objectives of the corrections system."  Wisniewski v. Fisher, 857 F.3d 152, 156 (3d Cir. 2017) (quoting Newman v. Beard, 617 F.3d 775, 781 (3d Cir. 2010)).  To establish a First Amendment retaliation claim, a prisoner must show that (1) "he was engaged in constitutionally protected conduct," (2) he suffered an "adverse action" by prison officials, and (3) the inmate's protected conduct was a "substantial or motivating factor" in the prison officials' decision to take the adverse action.  Id. (quoting Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001)).

Defendants do not challenge either of the first two elements for Henderson's retaliation claims.  Nor could they.  Utilizing the prison grievance system is unquestionably protected conduct, Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003), and being issued a misconduct resulting in disciplinary segregation or having medical treatment purposefully delayed would clearly constitute "adverse actions" by prison officials.  Instead, defendants argue that Henderson cannot show causation.

There are a variety of ways to establish causation for a First Amendment retaliation claim.  One method is to show "unusually suggestive" timing between the protected conduct and the adverse action.  See Lauren W. *ex rel.* Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).  When a plaintiff relies solely on circumstantial evidence of temporal proximity, the time between the protected conduct and the adverse action is often measured in days rather than weeks or months.  See Conrad v. Pa. State Police, 902 F.3d 178, 184 (3d Cir. 2018).[5]  Another approach is to demonstrate "a pattern of antagonism coupled with timing." DeFlaminis, 480 F.3d at 267.  Finally, causation can be inferred "from the evidence gleaned from the record as a whole."  Watson v. Rozum, 834 F.3d 417, 424 (3d Cir. 2016) (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000)).

Most of the defendants Henderson targets can be disposed of in summary fashion.  There is simply no evidence that would show Henderson's January 17, 2018 grievance was the cause of a delay in medical treatment orchestrated by Miller, Mahally, Martin, Dr. Prince, or Dr. Amin.  Henderson filed this grievance months after he claims his arch bars should have been removed.  Thus, the alleged adverse action of intentionally delayed medical treatment actually began well *before* Henderson engaged in the protected conduct.

The record is likewise devoid of any other evidence that would tend to show a causal nexus between Henderson's First Amendment conduct and the claimed

---

[5] However, there is no "bright line rule limiting the length of time that may pass between a plaintiff's protected speech and an actionable retaliatory act by a defendant."  Conrad, 902 F.3d at 184.

adverse actions.  Henderson baldly alleges that Miller, Mahally, Martin, Dr. Prince, and Dr. Amin "directed" Owen to issue a "fabricated misconduct," (Doc. 1 at 11 ¶ 2; Doc. 66 at 6-7), but he fails to support that allegation with any evidence.  This failure is fatal at the Rule 56 stage; a plaintiff cannot rest on mere allegations when defending against a motion for summary judgment.  See Celotex Corp., 477 U.S. at 324; Pappas, 331 F. Supp. 2d at 315.  Consequently, we must grant judgment in favor of Miller, Mahally, Martin, Dr. Prince, and Dr. Amin on Henderson's First Amendment retaliation claims because there is no evidence of causation for these defendants.

By contrast, Henderson has proffered competent evidence of causation for defendants Owen and McKeown.  Specifically, Henderson testified during his deposition that Owen told him that he would make the misconduct "go away" if Henderson ceased filing grievances.  Henderson also testified that, prior to the start of the misconduct hearing, Owen and McKeown met privately and then once again offered him the same deal, which he refused.  This testimony constitutes evidence from which a juror could infer that Henderson's protected conduct was a substantial or motivating factor in the misconduct he received.  See Watson, 834 F.3d at 424.  Because Henderson has come forth with evidence to establish all three elements of his *prima facie* retaliation claim against Owen and McKeown, their Rule 56 motion must be denied.

C.  **Medical Malpractice**

Henderson never explicitly sets forth his state-law claims of medical malpractice. His complaint references "medical malpractice" only twice, (see Doc. 1 at 10 ¶ 1; id. at 32 ¶ 45), and then includes certificates of merit for Martin, Dr. Johnson, Dr. Amin, and Dr. Prince, (id. at 48-51). Only Dr. Johnson's pending motion for summary judgment addresses the medical negligence claims. (See Docs. 72, 73).[6]

Dr. Johnson's first argument is that Henderson's certificate of merit is deficient. Dr. Johnson contends that Pennsylvania Rule of Civil Procedure 1042.3(a)(2) and (e), when read together, prohibit a *pro se* plaintiff from filing a certificate of merit indicating that expert testimony is unnecessary. This interpretation is clearly unsound. The plain language of Rule 1042.3(a)(3) permits a plaintiff, "if not represented," to file a signed certificate of merit indicating that

---

[6] The DOC defendants previously moved for partial dismissal or, alternatively, for partial summary judgment. (Doc. 19). Although neither their motion nor brief in support specifically mentioned Henderson's malpractice claims, it appears that the broad language defendants employed—*e.g.*, "any claims relating to [Henderson's] arch bars" (Doc. 20 at 6)—led the Court to assume that defendants were challenging both federal and state-law claims. The Court accordingly included those claims in its disposition of defendants' motion. (See Doc. 35 at 18-19). Notably, the Court granted summary judgment "with respect to any and all . . . state law claims arising out of the failure to provide Henderson adequate medical treatment after the removal of the arch bars based on his failure to exhaust administrative remedies." (Doc. 35 at 19). That holding, however, was erroneous. There is no exhaustion-of-administrative-remedies requirement for state-law medical negligence claims; exhaustion is a prerequisite only for actions by prisoners "under section 1983 . . . or any other Federal law[.]" See 42 U.S.C. § 1997e(a). Thus, Henderson's state medical malpractice claims against the named DOC defendants remain intact, and the prior grant of partial summary judgment will be vacated.

"expert testimony of an appropriate licensed professional is unnecessary for the prosecution of the claim." PA. R. CIV. P. 1042.3(a)(3). This is exactly what Henderson did.

Subdivision (e) of Rule 1042.3 does not strip this option from a *pro se* plaintiff. That provision, in pertinent part, states, "If a certificate of merit is not signed by an attorney, the party signing the certificate of merit shall, in addition to the other requirements of this rule, attach to the certificate of merit the written statement from an appropriate licensed professional *as required by subdivisions (a)(1) and (2)*." PA. R. CIV. P. 1042.3(e) (emphasis supplied). Of course, if no "written statement from an appropriate licensed professional" is required—as is the case under subdivision (a)(3)—subdivision (e) simply does not apply.

Dr. Johnson's reading of Rule 1042.3 would create an irreconcilable conflict between subdivisions (a)(3) and (e), whereby (a)(3) would permit a *pro se* plaintiff to file a certificate of merit stating no expert testimony is needed, and (e) would prohibit it. Instead, the logical construction is that subdivision (e) merely has limited applicability. It requires an unrepresented party to include the written statement from a licensed professional together with the certificate of merit if the *pro se* party is proceeding under subdivision (a)(1) or (a)(2)—the provisions requiring such a statement. An attorney proceeding under subdivision (a)(1) or (a)(2), by contrast, is permitted to sign and file the certificate of merit without needing to attach the licensed professional's statement.

Dr. Johnson next argues that, because Henderson has certified that no expert testimony is required, he is bound by this certification and will not be permitted to put on expert testimony at trial. See PA. R. CIV. P. 1042.3(a)(3), Note.[7] According to Dr. Johnson, however, this case concerns "complex and multifaceted" medical and surgical issues. Consequently, it will require expert testimony, so Henderson will not be able to "make a *prima facie* case at trial" and judgment must be entered in Dr. Johnson's favor. (Doc. 73 at 5-6).

We are not so sure. The gravamen of Henderson's medical negligence claim appears to be that Dr. Johnson (and other medical providers) failed to address his serious medical needs in a timely fashion, causing him undue pain and suffering. A malpractice claim alleging failure to provide timely treatment for an obvious medical need may be one that does not require expert testimony. Cf. Natale, 318 F.3d at 579-80 (finding that expert medical opinion was not required for malpractice claim alleging failure to timely provide insulin treatment to diabetic prisoner). Moreover, Dr. Johnson has provided no evidence or case law to support this argument. We are thus unable grant summary judgment in his favor on Henderson's medical malpractice claim.

---

[7] The note to Rule 1042.3(a)(3) states, "In the event that the attorney certifies under subdivision (a)(3) that an expert is unnecessary for prosecution of the claim, in the absence of exceptional circumstances the attorney is bound by the certification and, subsequently, the trial court shall preclude the plaintiff from presenting testimony by an expert on the questions of standard of care and causation."

**IV.     Conclusion**

For the foregoing reasons, we will grant in part and deny in part defendants' motions (Docs. 60, 72) for summary judgment, as more fully set forth above and in the accompanying order.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:     November 24, 2021